UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHANN DEFFERT,

             Plaintiff,                           Case No. 1:13-cv-1351

v.                                            HON. JANET T. NEFF

WILLIAM MOE, *et al.*,

             Defendants.

_____/

## OPINION

Now pending before the Court is Defendants' Motion for Summary Judgment (Dkt 44). Plaintiff filed a response to Defendants' motion (Dkt 45), and Defendants filed a reply (Dkt 47). Plaintiff also recently filed a Notice of Supplemental Authority (Dkt 51). Having conducted a Pre-Motion Conference in this matter and having fully considered the parties' written submissions, stipulated statements of fact and accompanying exhibits, the Court finds that the relevant facts and arguments are adequately presented in these materials and that oral argument would not aid the decisional process. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court concludes that Defendants' motion is properly granted.

## I. FACTUAL BACKGROUND

Plaintiff is a resident of the City of Grand Rapids, Michigan ("the City") (JSF[1] ¶ 1). Defendants William Moe and Timothy Johnston are police officers employed by the Grand Rapids

---

[1]The parties agreed to a joint statement of uncontested material facts related to Defendants' motion (Dkt 40, J. Statement of Facts [JSF]), some of which is drawn from the 911 telephone call and the officers' in-car video system recordings.

Police Department (GRPD) (*id.* ¶¶ 3-4). This case arises from an incident on Sunday, March 3, 2013 when, at about 12:00 p.m., Plaintiff was walking down the public sidewalk along Michigan Avenue between Mayfield and Lakeside Drive in Grand Rapids, Michigan, openly carrying an FNP-45 Tactical pistol (*id.* ¶ 6). Plaintiff's pistol was secured in a leg holster (*id.* ¶ 7). At the time, Plaintiff had a TLR-2 rail mounted tactical light with a laser sight attached to the pistol (*id.* ¶ 8).

It is undisputed that Plaintiff was legally entitled to openly carry his pistol (JSF ¶ 9). Specifically, the parties agree that openly carrying a pistol is lawful in Michigan, so long as the person is carrying the firearm with lawful intent and the firearm is not concealed, according to Michigan State Police Legal Update Bulletin No. 86 (*id.* ¶ 35). It is also not in dispute that all Grand Rapids Police Department Officers received a copy of MSP Bulletin No. 86 from the GRPD Training Unit Commander (*id.* ¶ 36). Further, the Grand Rapids Police Department has trained GRPD officers on the subjects of firearms laws and "open carry" through emails and in-house training sessions (*id.* ¶ 37).

On the day in question, a person in Plaintiff's vicinity called 911 to report a man with a gun, as follows:

> THE CALLER: Hi, I just got out of church and I was driving down Michigan Street, and I don't know if it's illegal, but it looks like, maybe he's not, but looks like the guy has got, a, a gun strapped to his right leg on the outside of his pants.
>
> THE DISPATCHER: Okay, he's got it in a holster?
>
> THE CALLER: Yeah.
>
> THE DISPATCHER: Okay, it's not illegal to open carry.
>
> THE CALLER: Oh, god, kind of alarming.
>
> THE DISPATCHER: Well, you'll probably be seeing more and more of it since all the school shootings and stuff people are exercising their open carry laws.

2

THE CALLER:  All right. It's just kind of scary, because he's wearing camouflage and, and do you have to have a license or?

THE DISPATCHER:  Well—

THE CALLER:  Just asking.

THE DISPATCHER:  To have a handgun you have to have a, a weapons permit, yeah.

THE CALLER:  Right. Because it is, it has to be a handgun, because it's—

THE DISPATCHER:  Right.

THE CALLER:  But you can even carry a rifle down the street?

THE DISPATCHER:  Well, brandishing a rifle and open carrying a handgun in a holster is two different things.

THE CALLER:  Okay.

THE DISPATCHER:  Okay.

THE CALLER:  It just seemed alarming to me.

THE DISPATCHER:  Okay. Where was this on Michigan Street?

THE CALLER:  1700 block of Michigan.

THE DISPATCHER:  Uh-huh, and the person was in all camouflage?

THE CALLER:  The shirt, it looked like a Columbia jacket, but it's green.

THE DISPATCHER:  Okay.

THE CALLER:  But the pants were camouflage and the holster is clearly on the outside of his pants on his right leg.

THE DISPATCHER:  Okay. Which way was he walking?

THE CALLER:  He was walking, up, towards higher numbers.

THE DISPATCHER:  Okay, but he wasn't threatening anybody?

THE CALLER:  No, he was by himself.

(JSF ¶ 10).

The emergency operations communicator dispatched the following call to officers:  "1721 and 1723 check the 1700 block of Michigan Northeast for a suspicious person. Caller saw an unknown male wearing a jacket and camouflage pants, appears to have a, a handgun in a leg holster. He was last seen walking eastbound on Michigan" (JSF ¶ 11).  Officer Moe, identified by his cruiser number 1721, responded to the call (*id.* ¶ 12).  Moe located a male in the 2000 block of Michigan with a handgun on him, and reported to dispatch:  "looks like he's talking to nobody.  He's got light, or a gray jacket with fluorescent green on it that's on his jacket.  We'll be making contact here. Priority traffic" (*id.* ¶ 13).

Plaintiff was not talking on a cellular telephone (JSF ¶ 14).  Rather, he was singing "Hakuna Matata," a song from the movie "The Lion King" (*id.* ¶ 15).  Officer Moe followed behind Plaintiff in his cruiser until Plaintiff turned to cross the street and saw Moe's cruiser (*id.* ¶ 16).  Officer Moe stopped his cruiser in the middle of the street and approached Plaintiff on foot, with his service firearm drawn and pointed toward Plaintiff (*id.* ¶ 17).  Officer Moe ordered Plaintiff to lie on the ground on his stomach (*id.* ¶ 18).  Plaintiff complied (*id.*).  Plaintiff repeatedly offered his identification to Officer Moe (*id.* ¶ 19).  While Plaintiff was on the ground, Officer Moe handcuffed him behind his back and removed Plaintiff's pistol from its holster (*id.* ¶ 20).  The following conversation transpired:

OFFICER MOE:  Why do you have a hand gun on you?

PLAINTIFF:  It's my constitutional right to defend myself.

OFFICER MOE:  Put your hands behind your back.

4

> PLAINTIFF: May I ask why I'm being stopped?
>
> OFFICER MOE: Because you've got a handgun walking down the street.
>
> PLAINTIFF: Lawful possession of a handgun is not a reason to cite me, or arrest me, or detain me, Officer.
>
> OFFICER MOE: Yes, it is until I figure out what is going on.

(*id.* ¶ 21). Plaintiff further explained that he was walking home after eating breakfast at a nearby restaurant (*id.*).

Shortly thereafter, Officer Johnston arrived on the scene and moved Officer Moe's vehicle, parking it just north of the driveway where Moe had detained Plaintiff (JSF ¶ 22). Officer Moe helped Plaintiff to his feet and had him sit sideways in the back of Moe's cruiser with his legs hanging outside the open door (*id.* ¶ 23). After Plaintiff was seated, Moe returned to the driver's seat of the cruiser to run Plaintiff's information through Michigan's Law Enforcement Information Network (LEIN) (*id.* ¶ 24). After Johnston moved his own vehicle in front of Officer Moe's, he walked over to where Plaintiff was seated (*id.* ¶ 25). Officer Moe (seated in the front seat), Plaintiff (still sitting sideways in the backseat) and Officer Johnston (standing facing Plaintiff) engaged in a spirited conversation on matters of public policy (*id.* ¶ 26). Officer Johnston did not have physical contact with Plaintiff during the stop (*id.* ¶ 33).

Plaintiff asked Officer Moe to call a supervisor to the scene (JSF ¶ 27). Sergeant Stephen LaBrecque arrived on scene and removed the handcuffs (*id.* ¶ 28). Officer Moe unloaded the pistol and returned it to Plaintiff, along with the ammunition and his identification (*id.* ¶ 29). Plaintiff was not arrested or charged with any crime (*id.* ¶ 30). The entire contact lasted approximately thirteen minutes (*id.* ¶ 31). Sgt. LaBrecque wrote a memorandum to Captain Pete McWatters, Officer Moe's

commander, recommending that Officer Moe "would benefit from some additional training in handling 'open carry' issues" (*id.* ¶ 32).

Plaintiff initiated this case on December 20, 2013, amending his Complaint on February 24, 2014. Plaintiff alleges the following six claims against the City and Officers Moe and Johnston:[2]

    I.        Fourth and Fourteenth [sic] Amendment Violations

    II.       Second and Fourteenth Amendment Violations

    III.     First and Fourteenth Amendment Violations

    IV.     Michigan Constitution Article 1 Section 6 Claim

    V.      State Law Assault and Battery

    VI.     State Law False Imprisonment

(Dkt 14). Defendants filed an Answer (Dkt 16), and, pursuant to the Court's Case Management Order (Dkt 12), the parties subsequently engaged in discovery and a case evaluation hearing in July 2014 (Dkt 22). Following a Pre-Motion Conference in December 2014, the Court issued a briefing schedule on Defendants' proposed motion for summary judgment (Dkt 37). The parties filed their motion papers in March 2015 (Dkts 40-50).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must consider the evidence and all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burgess v. Fischer,*

---

[2]Plaintiff's original Complaint named Grand Rapids Police Chief Kevin Belk and Sergeant LaBrecque as Defendants; however, Plaintiff did not name either Belk or LaBrecque in his Amended Complaint.

735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citation omitted).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess,* 735 F.3d at 471 (quoting *Matsushita*, 475 U.S. at 587). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sierra Brokerage Servs.*, 712 F.3d at 327 (quoting *Anderson,* 477 U.S. at 251-52).

## III.  LEGAL ANALYSIS

### A.  Section 1983 Framework (Counts I–III)

42 U.S.C. § 1983 provides a right of action against every "person who, under color of [law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." To prevail on a § 1983 claim, a plaintiff must (1) prove the violation of a right secured by the Constitution or laws of the United States, and (2) show that the deprivation of that right was committed by a person acting under color of state law. *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). That the officers in this case were acting under color of state law, the second element, is not in dispute (JSF ¶ 5).

A municipal corporation is a "person" within the meaning of § 1983. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *Holloway v. Brush*, 220 F.3d 767, 772 (6th

Cir. 2000) (en banc). Municipalities may be held liable for the constitutional violations of their employees only where the municipality's policy or custom led to the violation. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Monell*, 436 U.S. at 694-95). "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Burgess*, 735 F.3d at 478).

The inadequate-training theory that Plaintiff advances in this case (Dkt 14, Am. Compl., ¶ 39; Pl.'s Resp., Dkt 45 at 11-14) requires a plaintiff to prove three distinct facts: (1) "that a training program is inadequate to the tasks that the officers must perform"; (2) "that the inadequacy is the result of the city's deliberate indifference"; and (3) "that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390-91 (1989)). "[I]t is well settled that '[t]here can be no *Monell* liability under § 1983 unless there is an underlying unconstitutional act." *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *Robertson, supra* (same); *Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 879 (6th Cir. 2000) (same).

Last, a government official seeking qualified immunity may defend a § 1983 lawsuit on one or both of two grounds: (1) that his conduct did not violate the plaintiff's constitutional or statutory rights, or (2) that any right violated had not been "clearly established" at the time of the violation. *Garceau v. City of Flint*, 572 F. App'x 369, 371 (6th Cir. 2014) (citing *Harlow v. Fitzgerald*, 457

8

U.S. 800, 818 (1982)). The purpose of such immunity is to protect officials from "undue interference with their duties and from potentially disabling threats of liability." *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014) (quoting *Harlow*, 457 U.S. at 806). To ensure robust protection, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley*, 475 U.S. at 341. "Each defendant's liability must be assessed individually based on his own actions." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 402 (6th Cir. 2015) (citing *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

1.      **Fourth Amendment (Count I)**

In Count I, Plaintiff alleges that Defendant Officers violated (a) his "right to be free from unreasonable searches and seizures of his person and property, protected by the Fourth Amendment, as incorporated by the Fourteenth Amendment," and (b) his "right to liberty protected in the substantive component of the Due Process Clause of the Fourteenth Amendment, which includes personal safety and freedom from captivity" (Dkt 14, Amend. Compl. ¶ 34). As for the City's liability, Plaintiff alleges that the City (1) "authorized, tolerated, ratified, permitted, or acquiesced in the creation of policies, practices, and customs that established a de facto police [sic] of deliberate indifference to Officers' unlawful harassment of individuals such as Plaintiff, specifically by adopting Ord. No. 67-11" and (2) "has not properly trained its officers in Michigan firearms law and has thus repeatedly violated the constitutional rights of individuals in similar situations to the Plaintiff" (*id.* ¶¶ 38-39).

9

The right at issue in Plaintiff's Count I is the Fourth Amendment right to be free from "unreasonable searches and seizures." U.S. CONST. Amend. IV. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998). Consequently, as threshold matter, the Court agrees with Defendants that they are entitled to summary judgment of Plaintiff's claim in Paragraph 34(b) of his Amended Complaint of a "liberty deprivation" under the substantive due process clause of the Fourteenth Amendment because such a claim is subsumed by the Fourth Amendment (Defs.' Br., Dkt 46 at 2-3). Additionally, Plaintiff appears to have waived the substantive due process claim, indicating in his Response to Defendants' motion that he has "not pled a count which is solely dependant upon the Fourteenth Amendment" (Pl.'s Resp., Dkt 65 at 6).

Turning to Plaintiff's search-and-seizure Fourth Amendment claim in Paragraph 34(a) of Count I, Defendants do not dispute that Plaintiff was "seized" within the meaning of the Fourth Amendment, i.e., that Plaintiff's freedom of movement was restrained. Rather, Defendants argue that Officers Moe and Johnston are entitled to summary judgment because Moe was justified in stopping and briefly detaining Plaintiff as a community-caretaking function, or, alternatively as a reasonable investigatory stop (Defs.' Br., Dkt 46 at 3). Defendants point out that even if the investigatory stop was not reasonable, Officer Johnston did not violate Plaintiff's Fourth Amendment rights where Johnston did not play an active role in the stop (*id.* at 11). Next, Defendants argue that the City is entitled to summary judgment of Count I because it is not liable for constitutional violations that did not occur (*id.* at 12). Last, Defendants argue that even if

10

Plaintiff's rights were violated, Plaintiff can point to no City custom or policy that was the moving force behind his constitutional injury (*id.* at 12-14). The Court will consider each argument, in turn.

(a) *Exigent Circumstances*

The Supreme Court has carefully crafted certain exceptions to the warrant requirement, one of which is the exigent-circumstances exception. *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008). The Court articulated four situations that may give rise to exigent circumstances, including (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others. *Id.* According to the Sixth Circuit Court of Appeals, the fourth risk-of-danger exigency has been most frequently applied in cases where government actors were performing "community-caretaker" functions rather than traditional law-enforcement functions. *Id.* The Supreme Court has described police officers' community caretaking functions as investigatory functions performed where "there is no claim of criminal liability," functions "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). *See also Gupta v. Crane*, No. 1:09-CV-573, 2010 WL 775222, at *3 (W.D. Mich. Feb. 26, 2010) ("[T]he community-caretaker rule recognizes that authorities frequently engage in actions to guarantee the safety of the public").

A government actor, in order to satisfy the exigent-circumstances exception, must show that "there was a risk of serious injury posed to himself or his fellow officer or others that required swift action." *Ziegler*, 512 F.3d at 785. In reviewing whether exigent circumstances were present, the court must consider "the totality of the circumstances and the inherent necessities of the situation at the time." *Id.* (quoting *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996) (citation and

11

quotation marks omitted)). "[T]he critical issue is whether there is a 'true immediacy' that absolves an officer from the need to apply for a warrant and receive approval from an impartial magistrate." *United States v. Washington*, 573 F.3d 279, 288 (6th Cir. 2009). Applying the fourth risk-of-danger exigency in the context of community caretaker functions "does not provide the government with refuge from the warrant requirement except when delay is reasonably likely to result in injury or ongoing harm to the community at large." *Id.* at 289. *See, e.g., Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (applying the risk-of-danger exception to a warrantless entry of a burning building); *Thacker v. City of Columbus*, 328 F.3d 244, 254-55 (6th Cir. 2003) (applying the risk-of-danger exception in response to a 911 call reporting an injury).

Defendants argue that Officer Moe's actions in this case fall well within the scope of his community caretaking functions where (1) the stop was based on specific, articulable facts; (2) Officer Moe's interest in determining that Plaintiff was not about to use his weapon to harm himself or others outweighs Plaintiff's interest in not being disturbed by government intrusion; and (3) the duration and (4) scope of the seizure were limited to accomplishing its purpose (Defs.' Br., Dkt 46 at 5-6, citing *United States v. Garner*, 416 F.3d 1208, 1213 (10th Cir. 2005) (employing a four-prong test to assess the reasonableness of a community-caretaking seizure)).

Plaintiff responds that the facts of the cases upon which Defendants rely involved immediate threats and that he, in contrast, posed "no such immediate threat to justify a seizure" (Pl.'s Resp., Dkt 45 at 7). Plaintiff indicates that "one-in-twenty people Officer Moe passes on a daily basis is carrying a firearm" and that "[a]nybody wearing a jacket could have 'tactical accessibility' to a firearm" (*id.* at 7-8). Indeed, Plaintiff opines that his "drop leg holster," which Defendants characterize as a "tactical holster," "actually increases the distance, and therefore time, to draw a

12

firearm" (*id.* at 8).  Plaintiff also asserts that Officer Moe's actions—pointing a gun at Plaintiff from across the street, disregarding Plaintiff's attempts to offer his identification, and lecturing Plaintiff— "fall outside the scope of the community caretaker function" (*id.*).

Defendants' argument has merit.

Plaintiff's subjective assessment of whether his behavior posed an immediate threat is not the appropriate lens through which the officers' actions are viewed.  Rather, the Court "undertake[s] an objective assessment of an officer's actions in light of the facts and circumstances then known to him."  *Scott v. United States*, 436 U.S. 128, 137 (1978).  "An action is 'reasonable' under the Fourth Amendment . . . 'as long as the circumstances, viewed objectively, justify [the] action.'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) (quoting *Scott*, 436 U.S. at 138).

Here, Plaintiff was walking in a residential neighborhood across the street from a church in service on a Sunday morning (JSF ¶ 10; Defs.' Ex. A., Dkt 46-1, Moe Aff. ¶ 5).  He was wearing camouflage pants and an FNP-45 Tactical pistol secured in a leg holster, with a TLR-2 rail mounted tactical light with a laser sight attached to the pistol (JSF ¶¶ 10-11; Moe Aff. ¶¶ 4-6, 23).  Plaintiff's appearance and behavior, which included singing "Hakuna Matata" loudly enough to be heard from a police cruiser, was sufficiently alarming to a resident to call 911 (JSF ¶ 13; Moe Aff. ¶ 10). Officer Moe, an officer who spent more than eleven years assigned to the neighborhood where Plaintiff was walking, did not recognize Plaintiff and attested that he thought Plaintiff "may have had mental issues and was about to commit a violent crime" (JSF ¶ 13; Moe Aff.  ¶¶ 2-3, 9-11).

The Court agrees with Defendants that the totality of the circumstances, and the inherent necessities of the situation, objectively demonstrate that a true immediacy existed, one that absolved Officer Moe from the need to apply for a warrant and receive approval from an impartial magistrate.

Specifically, Officer Moe was justified in following up on the neighbor's 911 call and using swift action to determine whether Plaintiff's behavior gave rise to a need to protect or preserve life or avoid serious injury, either of Plaintiff or of others in the neighborhood.  Defendant officers are therefore entitled to judgment as a matter of law on this basis.

        (b)    *Terry Stop*

Alternatively, Defendants, analogizing to the facts in *Embody v. Ward*, 695 F.3d 577, 580 (6th Cir. 2012), argue that Officer Moe's seizure was a reasonable investigative stop (Defs.' Br., Dkt 46 at 6, citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  Defendants opine, again under the totality of the circumstances, that Officer Moe had reasonable suspicion to stop and detain Plaintiff long enough to make sure he was not a threat to himself or others (*id.* at 9-11).

Plaintiff responds that "[t]he immediate case is easily distinguished from the *Embody* case" inasmuch as Plaintiff did not attempt to create a situation where "officers had to make a judgment call on whether this act was a crime" (Pl.'s Resp., Dkt 45 at 9).  Plaintiff asserts that the cases Defendants reference from the Eastern District of Michigan also "all share the commonality that there are statutory violations implicated by their facts," whereas "Plaintiff in this case was not suspected of any crime at all" (*id.* at 9-10).

Defendants' argument again has merit.

"Police officers may not stop citizens minding their own business on a public street in the absence of reasonable suspicion that they have committed, or are about to commit, a crime." *Family Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 604 (6th Cir. 2015) (citing *Terry*, 392 U.S. at 21-22).  "The *Terry* Court conditioned the constitutionality of a search arising from an investigatory stop on (1) whether the police initiated the stop lawfully and (2) whether the search was reasonably

related in scope and duration to its justification." *United States v. Bost*, ___ F. App'x ___, No. 13-5757, 2015 WL 1600253, at *2 (6th Cir. Apr. 9, 2015).

In *Embody*, 695 F.3d at 579, the plaintiff went to a state park on a Sunday afternoon, dressed in camouflage, with a fully-loaded Draco AK-47 pistol slung across his chest.  Park visitors reported their concerns about the plaintiff to park rangers.  *Id.*  A park ranger found the plaintiff in a parking lot and ordered him to the ground at gun point.  *Id.* at 580.  Without arresting the plaintiff, the ranger removed the gun, patted him for other weapons and detained him.  *Id.*  When the local police officers arrived, the ranger explained his concern that the plaintiff's weapon was illegal, and the officers conducted a weapons check to determine the gun's status.  *Id.*  Meanwhile, the plaintiff requested the presence of a police supervisor, even after the officers advised him it would delay his release. *Id.*  Once the officers confirmed that the firearm fit the definition of a handgun under state law, the ranger returned the gun to the plaintiff and released him.  *Id.*  The incident lasted about two and one-half hours.  *Id.*

The plaintiff sued the park ranger, claiming his Second, Fourth and Fourteenth Amendment rights had been violated.  Pertinent here is the Sixth Circuit's rejection of the plaintiff's Fourth Amendment argument.  First, the Sixth Circuit reasoned that "Embody's AK-47, carried openly and fully loaded through a state park, gave [the ranger] ample reason for suspicion that Embody possessed an illegal firearm." *Embody*, 695 F.3d at 580.  Second, the Sixth Circuit determined that the scope of the ranger's investigation was reasonably related to the circumstances that justified the stop.  *Id.* at 581. Indeed, the Sixth Circuit found that "[o]rdering Embody to the ground at gun point was not an excessive intrusion given the existence of a loaded weapon, [and] the risk to officer (or public) safety if Embody had been up to no good. . ." *Id.*  In conclusion, the Sixth Circuit observed

15

that "[t]o [Embody's] mind, all that matters is that carrying an AK-47 pistol in a state park is legal under Tennessee law; the gun's resemblance to an assault rifle, the conspicuous arming of it, his military clothing and the concerns of passers-by add nothing.  But the constitutional question is whether the officers had reasonable suspicion of a crime, not whether a crime occurred.  Otherwise, all failed investigatory stops would lead to successful § 1983 actions."  *Embody*, 695 F.3d at 581.

Similarly, in this § 1983 action, Plaintiff was walking in a residential neighborhood across the street from a church in service on a Sunday morning (JSF ¶ 10; Defs.' Ex. A., Dkt 46-1, Moe Aff. ¶ 5).  He was wearing camouflage pants and an FNP-45 Tactical pistol secured in a leg holster, with a TLR-2 rail mounted tactical light with a laser sight attached to the pistol (JSF ¶¶ 10-11; Moe Aff. ¶¶ 4-6, 23).  Like the park ranger in *Embody*, Officer Moe did not randomly stop Plaintiff.  Rather, Plaintiff's appearance and behavior, which included singing "Hakuna Matata" loudly enough to be heard from a police cruiser, was sufficiently alarming to a resident to call 911 (JSF ¶ 13; Moe Aff. ¶ 10).  Officer Moe, an officer with then 23 years' policing experience, responded to the 911 call, observed Plaintiff and attested that he thought Plaintiff "may have had mental issues and was about to commit a violent crime" (JSF ¶ 13; Moe Aff.  ¶¶ 2-3, 10-11).  Officer Moe knew that Michigan law prohibits issuance of a firearms license to a person who is subject to an order of involuntary hospitalization due to mental illness, or an order of legal incapacity due to mental illness (Moe Aff.  ¶¶ 20, 25-26; *see* MICH. COMP. LAWS § 28.422(1) & (3)(a)(*i*)-(*ii*) (License to purchase), § 28.425b(7)(d)(*i*)-(*ii*) (License application).

Again, Plaintiff's subjective perspective of the circumstances is irrelevant to the *Terry* stop analysis.  Like the plaintiff in *Embody*, Plaintiff repeatedly emphasizes that carrying his firearm on a public sidewalk is legal, assigning no significance to his location outside a church in service, the

conspicuous placement of his firearm in a low leg tactical holster, the tactical light with laser mounted on his firearm, his military clothing, his loud singing of a song from a children's movie, or the resulting concerns of at least one person leaving church.  Likewise, it is not the role of this Court to subjectively weigh a police officer's options and "dictate the precise methods of investigation to be pursued by police officers.  Indeed, '[a] creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished,' but this would require us to 'indulge in unrealistic second-guessing.'"  *United States v. Winters*, 782 F.3d 289, 302-03 (6th Cir. 2015) (quoting *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985)).  *Cf. Baker v. Smiscik*, 49 F. Supp. 3d 489, 498 (E.D. Mich. 2014) (opining that to prevent the "recurrent tragedies triggered by gun violence in public spaces, ... police are properly given sufficient freedom of action to investigate circumstances that reasonably suggest an immediate risk to officer or public safety").

The Court determines that under the totality of the circumstances, Officer Moe had reasonable suspicion to stop and only briefly detain Plaintiff.  *See Northrup v. City of Toledo Police Dep't*, ___ F.3d ___, No. 14-4050, 2015 WL 2217061, at *4 (6th Cir. May 13, 2015) (citing *Embody* as support for the proposition that an officer may be justified in seizing a plaintiff who appears to not be legally carrying a gun).  Further, given the risk to the officer or others posed by a loaded weapon, Officer Moe's decision to first disarm Plaintiff was a prudent and objectively reasonable decision.  Last, Officer Moe diligently pursued a means of investigation likely to quickly confirm or dispel his suspicions, to wit:  detaining Plaintiff for a total of only thirteen minutes to run the LEIN check.  Like the park ranger in *Embody*, Defendant officers here are also entitled to judgment as a matter of law on Plaintiff's § 1983 claim for a violation of the Fourth Amendment.

In sum, based on the applicable law, the facts viewed in the light most favorable to Plaintiff support alternate justifications for the warrantless seizure on March 3, 2013 and the legal conclusion that no Fourth Amendment violation occurred.[3]

(c) *Qualified Immunity*

Even if Officer Moe's actions violated Plaintiff's Fourth Amendment rights, Plaintiff did not, on these undisputed facts, have a "clearly established right" that was violated. Police officers of "reasonable competence" could disagree about whether Officer Moe's conduct in temporarily disarming and briefly detaining Plaintiff for investigation would have violated Plaintiff's rights; therefore, the Court finds that Officer Moe is entitled to qualified immunity. *See, e.g., Baker*, 49 F. Supp. 3d at 499-500 (where suspect who openly carried a rifle and handgun in a restaurant did not have a clearly established Second Amendment right to openly carry firearms in a private business establishment, district court held that police officers who detained and disarmed suspect in order to investigate were entitled to qualified immunity with regard to suspect's § 1983 claim for violation of Fourth Amendment).

(d) *The City*

With regard to the City's liability for the Fourth Amendment violation alleged in Count I, Plaintiff argues that by (1) "leaving enacted a statute which violated Plaintiff's rights" and (2) "training their officers within an environment hostile to Plaintiff's rights, Defendant City of Grand

---

[3]As Defendants point out in Reply (Dkt 47 at 3), Plaintiff did not respond to their argument that Officer Johnston did not participate in the initial stop of Plaintiff and that it was reasonable and permissible for Officer Johnston to rely on information provided by Officer Moe in assisting with the stop (Defs.' Br., Dkt 46 at 11). Consequently, even if the officers were not entitled to summary judgment on these alternate bases, Officer Johnston is nonetheless entitled to summary judgment because Plaintiff failed to present evidence that creates a genuine issue of material fact as to whether Officer Johnston violated his Fourth Amendment rights.

Rapids made a policy decision which was the moving force depriving Plaintiff of his rights" (Pl.'s Resp., Dkt 45 at 13-14).  However, the City may not be held liable for a violation that did not occur. "Without a deprivation, policy does not matter."  *Toth v. City of Toledo*, 480 F. App'x 827, 832 n.2 (6th Cir. 2012); *Standifer v. Lacon*, 587 F. App'x 919, 923 (6th Cir. 2014) (same); *Whitson v. Knox Cnty. Bd. of Educ.*, 468 F. App'x 532, 541 (6th Cir. 2012) (same).  Similarly, without an underlying constitutional violation, the City is not subject to suit for inadequacies in training its police officers. *See, e.g., Smith v. Erie Cnty. Sheriff's Dep't*, ___ F. App'x ___, No. 14-3157, 2015 WL 831730, at *9 (6th Cir. Feb. 26, 2015); *S.L. ex rel. K.L. v. Pierce Twp. Bd. of Trustees*, 771 F.3d 956, 962 (6th Cir. 2014); *Amerson v. Waterford Twp.*, 562 F. App'x 484, 491 (6th Cir. 2014); *Cutlip v. City of Toledo*, 488 F. App'x 107, 111 (6th Cir. 2012).  All three Defendants are therefore entitled to summary judgment of Count I in their favor.

## 2.    Second Amendment (Count II)

In Count II, Plaintiff alleges that "Defendant Officers' decision to seize Plaintiff's pistol, without justification or provocation, violated his Second Amendment individual right, as incorporated by the Fourteenth Amendment, to keep and bear arms" (Dkt 14, Amend. Compl. ¶ 43). As for the City's liability, Plaintiff alleges that his injury was "a direct and proximate result of Defendant Officers' actions and the policies, practices, and customs of the Grand Rapids Police Department and the City of Grand Rapids described above" (*id.* ¶ 44).

(a)    *Qualified Immunity*

In support of summary judgment in their favor on Count II, Defendants point out that "the right [to bear arms is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" (Defs.' Br., Dkt 46 at 15, quoting *Heller*, 554 U.S. at 626).

19

Defendants argue that Officers Moe and Johnston are immune from civil liability because any Second Amendment right to openly carry a gun was not "clearly established" in March 2013 (*id.*).

Plaintiff responds that "[i]t is obvious that bearing arms outside one's home is a right that has been protected under the Second Amendment since its adoption" (Pl.'s Resp., Dkt 45 at 15). Relying on *McDonald v. City of Chicago*, 561 U.S. 742 (2010), Plaintiff asserts that the "core" of the Second Amendment right to bear arms is "to be able to defend oneself" and that that right "must logically follow to wherever oneself is located" (*id.* at 16). Plaintiff opines that "Officer Moe's targetting [sic] of Plaintiff for the exercise of his Second Amendment right to carry a firearm is an injury of that right just as surely as the arrest of an individual for the expression of political opinion would be an injury of the First Amendment right to freedom of speech" (*id.*).

Courts may exercise their sound discretion in deciding to first address (1) whether facts alleged or shown by plaintiff make out violation of constitutional right, or (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Jefferson v. Lewis*, 594 F.3d 454, 460 (6th Cir. 2010). Here, the Court turns first to the latter inquiry and determines that Defendants are entitled to summary judgment of Count II because the right Plaintiff claims was not clearly established at time of Defendants' alleged misconduct.

Deciding whether a law is "clearly established" in an inquiry that must be "undertaken in light of the specific context of the case, not as a broad general proposition." *Floyd v. City of Detroit*, 518 F.3d 398, 405 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In *McDonald*, 561 U.S. at 791, the Supreme Court held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." In *Heller,* in turn,

20

the Court had struck down the District of Columbia's firearms regulations, but only to the extent those regulations interfered with a resident's "right to render a firearm operable and carry it about his home in that condition only when necessary for self-defense." 554 U.S. at 576. As Defendants emphasize, the Supreme Court in *Heller* expressly declared that "the right secured by the Second Amendment is not unlimited" and similarly instructed that the right to bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

As Plaintiff himself concedes, "neither the Sixth Circuit nor the Supreme Court have spoken on the specific issue of open carry" (Pl.'s Resp., Dkt 45 at 16). *See Tyler v. Hillsdale Cnty. Sheriff's Dept.*, 775 F.3d 308, 316 (6th Cir. 2014) (collecting cases in support of the proposition that "the full breadth of the Second Amendment has not been determined"), Reh'g en Banc Granted, Opinion Vacated (Apr. 21, 2015); *see also Powell v. Tompkins*, 783 F.3d 332, 348 n.10 (1st Cir. 2015) (collecting cases in support of the proposition that no consensus exists among the circuits as to whether, and to what extent, the limited Second Amendment individual right described in *Heller* extends beyond the hearth and home setting); *Baker v. Schwarb*, 40 F. Supp. 3d 881, 894 (E.D. Mich. 2014) (collecting cases in support of the proposition that "application of the Second Amendment (and specifically the right to bear arms for the purpose of self-defense) outside of the home, is unsettled"). Accordingly, the right Plaintiff alleges Defendants violated—the right to bear arms for the purpose of self-defense outside the home—was not "clearly established" under the Second Amendment in March 2013. Therefore, Defendants Moe and Johnston are entitled to qualified immunity from Plaintiff's Second Amendment claim in Count II.

(b)    *The City*

With regard to the City's liability for the Second Amendment violation alleged in Count II, Plaintiff briefly argues that "[t]hrough its requirement of licensing, Grand Rapids restricts the right to carry that is guaranteed under the Second Amendment" (Pl.'s Resp., Dkt 45 at 18).  Plaintiff's argument implicates Grand Rapids City Code § 9.173.3, which the parties agree provides that "[n]o person shall carry any firearm upon his or her person in any public street, alley or other place open to the public in the City of Grand Rapids," unless the person is licensed by the state to do so, or the weapon is unloaded and visibly inoperable (*id.* at 12, 17; Defs.' Reply, Dkt 47 at 6 n.3).

Officer Moe attested that "[n]o city ordinance factored into [his] decision to detain Deffert" (Moe Aff. ¶ 41), and Plaintiff acknowledges that the ordinance is not enforced (Pl.'s Resp., Dkt 45 at 11-12).  Plaintiff's argument amounts to nothing more than his assertion that the existence of an unenforced ordinance caused a violation of his Constitutional rights, an assertion that the Court finds a wholly unpersuasive basis for holding the City liable in this case.  Again, municipalities may be held liable for the constitutional violations of their employees only where the municipality's policy or custom led to the violation.  *Robertson*, 753 F.3d at 622 (citing *Monell*, 436 U.S. at 694-95).  Plaintiff's argument is not supported on this record.

Further, as Defendants point out, Plaintiff does not specifically argue that § 9.173 violates the Second Amendment, only that the ordinance conflicts with state law (Defs.' Br., Dkt 46 at 17; Pl.'s Resp., Dkt 56 at 17-18).  The ordinance's illegality under state law can neither add to nor subtract from its constitutional validity.  *See Snowden v. Hughes*, 321 U.S. 1, 11 (1944) ("[An action's] illegality under the state statute can neither add to nor subtract from its constitutional

validity.")). Section "1983 claims are designed to vindicate federal law, not state law." *Embody*, 695 F.3d at 581.

In short, all three Defendants are entitled to summary judgment of Count II in their favor.

**3.     First Amendment (Count III)**

In Count III, Plaintiff alleges "Defendants' actions violated the following Constitutional rights of Plaintiff:   (a) "Plaintiff's right to core political [sic] speech protected by the First Amendment and incorporated by the due process clause of the Fourteenth Amendment, which includes conduct intended to rally public support for a particular cause," and (b) "Plaintiff's right to symbolic expression protected by the First Amendment and incorporated by the due process clause of the Fourteenth Amendment, which includes conduct intended to inrcease [sic] awareness of a particular cause" (Dkt 14, Amend. Compl. ¶ 47).   As for the City's liability, Plaintiff again alleges that his injury was "a direct and proximate result of Defendant Officers' actions and the policies, practices, and customs of the Grand Rapids Police Department and the City of Grand Rapids described above" (*id.* ¶ 48).

To the extent Plaintiff attempts to allege two different constitutional violations in Count III of his Amended Complaint, the distinction has since become lost.    In his brief response to Defendants' arguments for summary judgment of Count III, Plaintiff references only "firearms-related symbolic speech," and the Court therefore determines that any "political speech" claim has been waived.

Defendants argue that Officers Moe and Johnston are entitled to summary judgment of Count III because Plaintiff cannot show that he was engaged in expressive conduct (Defs.' Br., Dkt 46 at 18).  Defendants assert that even if Plaintiff was engaged in expressive conduct, the officers' actions

were a justifiable and very brief restriction of expressive conduct permitted under the *O'Brien* test (*id.* at 20-21). Alternatively, Defendants argue that the officers are also entitled to qualified immunity on Plaintiff's First Amendment claim because openly carrying a firearm is not a clearly established form of expressive conduct (*id.* at 21-22).

In his Amended Complaint, Plaintiff alleges that his act of openly carrying a pistol in public was intended, "in part, to increase awareness that open carry is lawful in Michigan and to rally public support" (Dkt 14, Amend. Compl. ¶ 46). In his one-paragraph response to Defendants' arguments, Plaintiff additionally asserts that he was wearing "a shirt with the slogan 'It's not the Tool, it's the Fool' in an attempt to show his opposition to strict gun control measures," although Plaintiff concedes that, "due to cold weather, the shirt was covered up at the time he encountered Officer Moe" (Pl.'s Resp., Dkt 45 at 18). Plaintiff does not further elaborate on the merits of his First Amendment claim other than to indicate that he "challenges the authority Officer Moe had to detain him for carrying a pistol, and incorporates that argument against Officer Moe's interference with his right to free speech" (*id.*).

Defendants are entitled to summary judgment of Count III.

Conduct alone may be "'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)). However, the Supreme Court has "rejected 'the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.'" *Id.* (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). In order for conduct to qualify for First Amendment protection, the court must determine that (1) there was intent to convey a particularized message at

24

the time of the conduct; and (2) there was a great likelihood that "the message would be understood by those who viewed it." *Spence*, 418 U.S. at 410–11.

Even assuming arguendo that Plaintiff's intent after eating breakfast on March 3, 2013 was to carry his FNP-45 Tactical pistol with a TLR-2 rail mounted tactical light and laser sight in his leg holster to increase  awareness on the topic of gun control, the Court agrees with Defendants that the record nonetheless does not support a great likelihood that the message would be understood by those who viewed Plaintiff.  Plaintiff concedes that he was neither chanting nor reciting slogans concerning the right to bear arms or open carry, nor was he carrying any banner, sign, flag or poster advocating the right to bear arms or open carry (JSF ¶ 41).  His outerwear did not contain a slogan or statement advocating the right to bear arms or open carry, and his t-shirt, while arguably exhibiting such a slogan, was admittedly covered up when Plaintiff encountered Officer Moe (*id.* ¶¶ 42-43; Pl.'s Resp., Dkt 45 at 18).   Neither Officer Moe nor the person who called 911 apprehended Plaintiff's intended message.  The caller was merely alarmed.  And Officer Moe, who attested that "Deffert's behavior was not consistent with my experience with open carry advocates," similarly opined that Plaintiff's behavior was instead "more consistent with tactical preparedness for unlawful purposes" (Moe Aff. ¶ 40).

Even assuming arguendo that Plaintiff was engaged in protected speech such that the First Amendment comes into play, the next question is whether the officers' actions interfering with Plaintiff's purported expressive conduct were sufficiently justified.  *See generally O'Brien*, 391 U.S. at 377 (explaining that government regulation of conduct is sufficiently justified "if it is within constitutional power of government; if it furthers important or substantial governmental interest; if governmental interest is unrelated to suppression of free expression; and if incidental restriction on

25

alleged First Amendment freedom is no greater than is essential to furtherance of that interest"). In this regard, Plaintiff again fails to offer any substantive response to Defendants' argument that their actions were justified. Plaintiff merely incorporates his challenge to Officer Moe's authority to detain him, but whether Officer Moe had authority to "detain" Plaintiff is a different question from whether Officer Moe was justified in interfering with Plaintiff's purported expressive conduct.

In any event, the Court agrees with Defendants that where Officer Moe had the constitutional power to detain Plaintiff, *see supra*, there is no genuine issue of material fact on this record that his actions were taken in furtherance of an important or substantial government interest—to ensure that Plaintiff was not a danger to himself or the public, and not to suppress Plaintiff's "speech." *See Tanks v. Greater Cleveland Reg'l Transit Auth.*, 930 F.2d 475, 479 (6th Cir. 1991) (characterizing the insurance of public safety as both a substantial and compelling government interest). Further, the merely thirteen-minute detention posed only an "incidental burden on First Amendment freedoms that is no greater than is essential to further the government interest."

In sum, based on the applicable law, the facts viewed in the light most favorable to Plaintiff fail to demonstrate that any First Amendment violation has occurred. Because Plaintiff fails to demonstrate the violation of a clearly established constitutional right, the individual Defendants are also entitled to the protection of qualified immunity. Officers Moe and Johnston are therefore entitled to summary judgment on Plaintiff's Count III. Likewise, the City is entitled to summary judgment on Plaintiff's Count III because a municipality cannot have *Monell* liability for a constitutional violation that did not occur.

### B.  State-Law Claims (Counts IV–VI)

Last, Plaintiff alleges a violation of his "individual right to keep and bear arms under the Michigan Constitution" (Count IV), Assault and Battery (Count V) and False Imprisonment (Count VI).  Having dismissed the claims over which it has original jurisdiction, the Court, in its discretion, declines to exercise supplemental jurisdiction over the state-law claims in Counts IV through VI. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed.") (quoting *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996)).

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt 44) is properly granted.  An Order will be entered consistent with this Opinion.  Because this Order resolves the last pending claim in this case, the Court will also enter a corresponding Judgment.  *See* FED. R. CIV. P. 58.


DATED: June 1, 2015              /s/ Janet T. Neff_____
                                JANET T. NEFF
                                United States District Judge